**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA**

DAVID LEE KIDD, II,

    Petitioner,                            Civil Action No. 5:14CV122
                                                Criminal Action No.   5:11CR17
                                                         (STAMP)

   v.

UNITED STATES OF AMERICA,

    Respondent.

**UNITED STATES' RESPONSE TO
MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE,
OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY**

Now comes the United States of America and William J. Ihlenfeld, II, United States Attorney for the Northern District of West Virginia, by Assistant United States Attorney John C. Parr and files its response to Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody.

**I. SUMMARY OF PETITIONER'S CLAIM**

Petitioner (hereinafter "Kidd" or "defendant") filed a motion for relief under 28 U.S.C. § 2255 alleging as Ground One that he suffered ineffective assistance of counsel, in that (1) his counsel failed to preserve the record with respect to the firearm found in Defendant's safe; (2) he was given a sentence in excess of those received by his co-defendants; (3) his counsel failed to challenge or move to suppress certain evidence; (4) his counsel failed to effectively cross examine the government's witness resulting in a two-level enhancement; (5) he was denied the right to testify at sentencing; (6) his counsel failed to properly advise him with regard to the plea agreement resulting in an unknowing and involuntary waiver of his right to trial.  In Ground

Two, Kidd alleges that his arrest was pursuant to an illegal search of the vehicle in which he was a passenger in violation of the Fourth Amendment. In Ground Three, Kidd alleges that his Fifth Amendment right to due process was violated when he was denied opportunity to face his accusers and to testify at his sentencing hearing.

Defendant's Motion was filed in the Clerk's office on September 8, 2014. On the same date, the Court ordered the United States to file its response on or before thirty (30) days from the date of its order. On September 15, 2014, Kidd filed a thirty-eight page memorandum of law and supplemental brief which the Court later ordered stricken from the record due to Kidd's failure to comply with LR PL P 3.4.4. On October 7, 2014 Kidd re-filed the exact same memorandum, along with a motion to exceed the page limits. By Order entered on October 8, 2014, the Court denied in part the motion finding that Kidd did not demonstrate good cause to file thirty-four (34) excess pages, but granting Kidd the opportunity to file no more than seven additional pages on or before October 22, 2014. The Court further advised Kidd that this was not an opportunity for him to modify his arguments, simply to condense his memoranda in a more concise format. On October 23, 2014, Kidd filed his memorandum of law and supplemental brief discussing not only those arguments raised in his original motion, but also adding the following: (1) his counsel failed to investigate his co-defendants and the officers involved in his initial arrest; (2) his counsel failed to retain an expert witness to testify about the firearm; (3) his counsel failed to cross examine those witnesses whose statements were used to establish the drug weight; and (4) his counsel failed to object to the inclusion of a two-level enhancement for the contempt of Court charge. The Court ordered the United States to file its response on or before November 26, 2014.

## II. FACTS AND BACKGROUND

### A. PROCEDURAL HISTORY

On March 28, 2011, Kidd and co-defendant Christopher Grigg (hereinafter "Grigg") were named in a criminal complaint alleging they conspired to possess with intent to distribute and distribute Schedule II prescription pills, including but not limited to oxycodone, following their arrest on March 25, 2011 in the State of Florida. (Doc. 1)[1]. Kidd and Grigg were initially indicted on April 19, 2011 in a six count indictment alleging various violations of the Controlled Substances Act. (Doc. 20). As the case proceeded, a Superseding Indictment was returned on June 7, 2011, which added 17 co-defendants and numerous drug trafficking and money laundering counts against Kidd, Grigg and other individuals. (Doc. 36). Eventually, a Second Superseding Indictment was returned by a federal grand jury on December 13, 2011, which charged 22 individuals, including Kidd, for their roles in a prescription pill conspiracy. Kidd was named in 19 counts alleging his involvement in the conspiracy to distribute Schedule II controlled substances, conspiracy to launder monetary instruments, conspiracy to travel in interstate commerce to further racketeering enterprise, use of a telephone to facilitate the drug activity, distribution, various counts of distribution in aiding and abetting the distribution of oxycodone, and specific acts of money laundering. Within the body of the indictment, Kidd was identified as the organizer and leader of the conspiracy. (Doc. 364).

Prior to the return of the Second Superseding Indictment, Kidd was released on pre-trial conditions. On October 7, 2011, Kidd absconded from his federal bond supervision. Following an interstate manhunt, he was arrested on October 19, 2011 in Oklahoma, following a high speed chase. (PT, p. 42-43)[2].

The government's motion for a complex case designation was granted and trial was

---

[1] All references to "Doc." are references to documents filed in the underlying criminal matter, 5:11CR17
[2] All references to "PT" are references to the Plea Hearing Transcript

scheduled to begin on June 19, 2012. (Doc. 479).

On April 24, 2012, Kidd entered into a plea agreement wherein he agreed to plead guilty to Count One, conspiracy to distribute Schedule II controlled substances; Count Three, conspiracy to launder money; and to Count One, contempt of Court, of the Information attached to the plea agreement. He also agreed to admit to the forfeiture allegation. Among the items Kidd agreed to forfeit was the Harrington Richardson 32 Smith & Wesson firearm. Kidd further stipulated and agreed to (1) the total drug relevant conduct of between 2,800 and 4,475 grams to actual oxycodone (approx. 100,000 to 150,000 pills); (2) a three-level enhancement for his role in the offense pursuant to U.S.S.G § 3B1.1; and (3) a two-level enhancement pursuant to U.S.S.G. § 3C1.1. The parties further agreed that whether a two-level enhancement for possession of a firearm was appropriate would be decided by the Court. (Doc. 593). The Court accepted Kidd's plea on May 24, 2012. After a full Rule 11 proceeding, including discussion regarding his waiver of rights, stipulation of relevant conduct, and that no one had threatened or coerced him, Kidd entered a plea of guilty. (PT, pp. 44-45). Following the plea, a pre-sentence report was prepared.

The pre-sentence report followed the relevant conduct stipulation of the plea agreement and assessed enhancements for Kidd's role in the offense and for obstruction of justice. The report recommended a two-level enhancement for possession of a firearm and a three-level reduction for acceptance of responsibility. (Doc. 649).

Defense counsel filed three (3) objections to the pre-sentence report, one of which was an objection to the two-level enhancement for possession of a firearm. (*Id.*). At the sentencing hearing on October 22, 2012, the Court overruled defense counsel's objections and accepted the pre-sentence report. Defense counsel proceeded to argue for a variance. Among the arguments defense counsel made for a downward departure was Kidd's honorable service in the National

Guard, his lack of a prior criminal record, his work history and injury that led to his drug addiction, and the sentencing disparities between Kidd and his co-defendants. (ST, pp. 33-40).[3]

In response, the government argued that Kidd began selling, and having a co-defendant sell, oxycodone in 2006. As time progressed, Kidd recruited additional individuals and his enterprise became much more sophisticated. What began as having individuals drive to Florida to see different doctors to obtain narcotics evolved to a weekly flight by Kidd and others from Pittsburgh to Florida to purchase thousands of pills at a time and subsequently laundering the money through casinos. (ST, pp. 40-45). In all, 26 individuals were indicted, including one doctor. This was the largest pill distribution conspiracy in this district. (*Id.*).

Kidd admitted in open court that his total drug relevant conduct was between 100,000 and 150,000 oxycodone pills. (PT, pp. 10, 43-45). He also agreed to a three-level enhancement for his role in the enterprise. (*Id.*, pp. 11, 31, 43-45). As part of the plea agreement, the government agreed to let Kidd plead to one count of contempt of Court for absconding while on federal bond supervision, subjecting him to a potential six-month sentence. Had the government not agreed to this lesser charge, Kidd's sentence would have been fifty-eight (58) months higher. (ST, p. 45). In sum, had Kidd not absconded, there would not be a discrepancy between his sentence and that of his co-defendants given his admitted role in the conspiracy. (Doc. ST, p. 43). In accordance with the plea agreement, the government moved for a three-level reduction for acceptance of responsibility, even though the defendant fled, and recommended a sentence at the lower end of the guideline range. (ST, p. 45).

After hearing from the parties, the Court denied defense counsel's request for a variance, and sentenced Kidd to the lowest end of the guideline range, 262 months. (ST, p. 48).

The defendant filed a timely notice of appeal on November 5, 2012. (Doc. 654). The

---

[3] All references to "ST" are references to the Sentencing Transcript

only issue raised with the Fourth Circuit Court of Appeals was whether the district court erred in applying a two-level enhancement for his possession of a dangerous weapon in accordance with U.S.S.G. § 2D1.1(b)(1). After reviewing the district court's factual findings for clear error, the Circuit Court found Defendant's arguments unpersuasive and affirmed the district court's judgment. (Doc. 687). The Circuit Court's mandate was filed on June 28, 2013. (Doc. 693). Defendant's instant motion, filed on September 8, 2014, is timely and not successive. In the instant motion, the defendant seeks to have his sentence vacated, a public defender appointed, an evidentiary hearing, and a revised pre-sentence report. (Doc. 699, 714).

B. <u>FACTUAL HISTORY</u>

In the spring of 2010, federal, state and local agents combined efforts to investigate an organization transporting oxycodone pills from Florida to the Moundsville/Wheeling area for redistribution in the northern panhandle of West Virginia and eastern Ohio. (PT, p. 30). The investigation, named Operation Double Down, revealed members of the group originally began traveling regularly to Florida in groups of 3 or more, sometimes going to two or three pain clinics on a trip. The clinics they routinely traveled to were located in the Jacksonville, Daytona Beach, and West Palm Beach area. (*Id*., pp. 30-31). During each trip, they usually would return with hundreds of Percocet 30 mg. pills (oxycodone), which then would be distributed and sold in the Wheeling area of the Northern District of West Virginia and eastern Ohio.

Kidd usually organized the trips, deciding who would go on each trip, what clinics they were going to, and paying for all the expenses on the trip, including the pills. (*Id.* p. 31). Various co-defendants often accompanied Kidd on this these trips getting scripts for oxycodone, including Chris Grigg, Kristen Anderson, Craig Vega, Megan Terlosky, Eric Terlosky, Donna Jones, Heather Burkey and others. (*Id.*).

When the trips were completed, the pills were returned to wherever Kidd was living at the time, including Clinton Avenue, Moundsville, hotel rooms at the Wheeling Island Casino, and residences in Ohio at 501 School Street, Martins Ferry and another house in Bridgeport. (*Id.*). There, Kidd, assisted by a few others, packaged the pills into lots of 50 or 100, after which Kidd and co-defendant Grigg would take the pills to their various distributors, oftentimes collecting money from the distributor for the last delivery and "fronting" the pills for resale to customers. (*Id.*).

During the summer of 2010, the organization changed how they were obtaining the majority of their pills. While they continued "doctor shopping" trips on a limited scale, they began receiving multiple hundreds of pills from individuals in Florida who had their own doctor shopping enterprise. On one of the Kidd's "doctor shopping" trips to Florida, he and co-defendant Robyn Jones recognized each other at a clinic in Jacksonville, Florida, from seeing each other on their then separate, but common, doctor shopping visits. They discussed their common doctor shopping practices, with Jones explaining to the defendant that she could supply him regularly with 30 mg. oxycodone pills in substantial quantities, allowing Kidd to reduce his travel costs for the entourage, while allowing him to obtain quantities greater than what he had been acquiring from his "doctor shopping" ventures. Kidd agreed and began receiving pills from Jones and her associates, co-defendants Jennifer Kennedy and Rick Roush, by the summer of 2010. (PT, pp. 32-33).

Like Kidd, the Florida suppliers traveled to multiple clinics in central and southern Florida, obtaining prescriptions for oxycodone in multiple ways, including purchasing scripts and/or pills from patients and other doctor shoppers, obtaining duplicate scripts, and utilizing false or doctored MRI's. After acquiring the pills, they would advise Kidd and he would travel to Florida, either by himself or with other co-defendants, including Grigg, Vega, the Terloskys,

7

and Anderson, to name a few.  Over the last few months of the conspiracy, the group traveled almost exclusively to Florida by plane, usually on Air Trans.  Air Trans records reflect Kidd traveled from Pittsburgh to Orlando/Daytona Beach between January 1, 2011 and March 22, 2011, twelve times with Grigg making at least two trips (Feb. 11, 2011 and March 24, 2011). (*Id.*, p. 33). Once there, they would rent a vehicle at the airport and travel to Daytona Beach and meet with co-defendants Robyn Jones, Jennifer Kennedy and Rick Roush, separately and jointly, usually receiving in excess of 1,000 pills and as many as 6,000 pills. (*Id.*, pp. 33-34, Doc. 649, p. 8).

On March 22, 2011, Kidd flew from Pittsburgh to Orlando with $70,000 in United States currency obtaining pills from Roush, Jones and Kennedy. When he realized they had more pills than he had cash for, Kidd called Grigg and directed him to travel to Kidd's residence at 501 School Street, Martins Ferry and take $30,000 more from the safe. (*Id.*, pp. 34-35).  Kidd arranged for a ticket for Grigg to fly with the money to Orlando from Pittsburgh, which he did on March 24, 2011. After meeting with the Kidd, Grigg and Kidd met with the three Florida connections, obtaining more pills and spending in excess of $84,000. (*Id.*, p. 35).  As they were returning to the Orlando airport, members of the Central Florida HIDTA stopped the rented vehicle, which Grigg was driving, for speeding. After searching the car, the Florida agents seized 6,543 oxycodone pills, 294 Xanax pills, and $15,500 in cash. The pills were concealed in M&M cylinders. (*Id.*, p. 35).

Grigg was advised of his rights and confessed.  In addition to admitting the pills were for distribution in the Wheeling area, he acknowledged being Kidd's lieutenant, drawing a salary of $500/week from Kidd, and being provided a house by Kidd in addition to the profits from the sale of the pills.  (*Id.*, pp. 35-36).

During a search of Kidd's and Grigg's residences the following day, agents here found an additional 1,830 oxycodone pills, more than 1,500 of which were at Kidd's Martins Ferry, Ohio residence, and almost $50,000 in drug proceeds in safes in their homes, $43,834 of which was at Kidd's. In the safe at Kidd's residence, the same safe Kidd had directed Grigg to get the money from and bring to Florida, agents also found several "drug ledgers" reflecting outstanding debts owed for pills previously fronted to several co-defendants, including Craig Vega, Georgann Dziorney, Fred Wildern, Brandon McCort, Jack Adkins and others. Each of the ledgers reflected debts for as many as 500 pills. (*Id.*, p. 36). Those individuals, all of whom pled guilty, acknowledged the ledgers were accurate to their drug debt with Kidd and Grigg. Lastly, found in Kidd's safe, were two MRI's for two female "pill doctor shoppers" used by Kidd to obtain pills in Florida. (ST, p. 11-12).

As the investigation was ongoing, the agencies developed numerous confidential sources. The various confidential informants made fifteen controlled buys from the group between May, 2010 and March, 2011, several directly or indirectly involving Kidd. (PT pp. 36-40).

As part of the conspiracy, Kidd undertook numerous money laundering activities to further his drug dealing. Kidd and Grigg would routinely wire money to pill suppliers from the Wheeling, West Virginia area to Florida. Money was sent in advance of their trip, when the suppliers needed more money to get a larger amount of pills. On other occasions if they were short of funds and still owed money for pills, they would wire the money when they returned from the trip. (Doc. 649, p. 10). During the investigation, through subpoenas for Western Union and Money Gram records, agents documented more than $30,000 of wire transfers which facilitated the drug transactions, from Kidd and others at his direction. (PT, p. 41). Additionally, Kidd would pay cash to rent vehicles used in the conspiracy to make doctor shopping trips to

Florida and for flights to Florida. Records reviewed reflect those payments exceeded $5,000. (Doc. 649, p. 10, PT pp. 41-42).

Likewise, Kidd utilized the drug proceeds to purchase numerous vehicles from one of his co-conspirators, co-defendant John "JB" Burress, a local car dealer, sometimes having the vehicles placed in other co-defendant's and conspirators names. He used the proceeds from his dealings to purchase a residence in Martins Ferry, Ohio for $36,500 on January 17, 2011. (PT, 41-42). Burress' name showed up on several of the drug ledgers found during the March 26, 2011, searches of Kidd's and Grigg's residences. (Doc. 649, p. 10).

Subsequent to his being indicted, Kidd was ordered released on pretrial conditions by the district court on July 29, 2011, with the condition of home confinement at his residence in Martins Ferry, Ohio, except for permitted absences granted by the probation officer. On October 7, 2011, he fled the jurisdiction to avoid his prosecution. He left his Ohio residence, first fleeing to New Jersey. (PT, p. 42). After purchasing a Lincoln Town Car, he then fled cross country until he was arrested following a high speed chase in Oklahoma. (PT, p. 42-43).

During the investigation, the United States seized directly from Kidd or his associates, acting at his direction, nearly 9,000 oxycodone 30 mg. tablets and more than $65,000 in drug proceeds. (Doc. 649, p.11). In his plea agreement, Kidd stipulated to relevant conduct of between 100,000 and 150,000 30 mg. pills. (Doc. 593, p. 6). He also admitted to holding a leader and organizer role in the conspiracy and the resultant three level enhancement. (*Id.*). Likewise, he agreed to a two-level enhancement for absconding. (*Id.*).

### III. RESPONSE TO DEFENDANT'S §2255

A. <u>Mandate Rule</u>

As part of the plea agreement, the parties agreed that whether a two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) for possession of a firearm was appropriate would be decided

by the Court. (*Id.*). The District Court ruled against Kidd, finding that it was not clearly improbable that the firearm was connected to the offense, and applied the two-level enhancement. (ST, pp. 23-24). Kidd appealed his sentence and raised, as his sole issue, the application of a two-level enhancement for a firearm. The Fourth Circuit Court of Appeals found that the District Court's decision was not clearly erroneous and affirmed the District Court's judgment. (Doc. 687). Arguments made to and ruled upon by appellate courts are barred from consideration under the mandate rule. The mandate rule, "forecloses relitigation of issues expressly or impliedly decided by the appellate court." *United States v. Bell,* 5 F.3d 64, 66 (4th Cir. 1993). Issues previously decided on direct appeal cannot be recast in the form of a §2255 motion. *Davis v. United States*, 417 U.S. 333, 342 (1974). Since this issue was determined by the Fourth Circuit, Kidd's arguments relating to the two-level enhancement for the firearm in this petition are not tenable.

B. <u>Plea Agreement</u>

In his plea, Kidd stipulated to total drug relevant conduct of between 2,800 and 4,475 grams of actual oxycodone (approximately 100,000 to 150,000 pills). (Doc 593, p. 6). He further stipulated to a three-level enhancement for his role in the offense and a two-level enhancement for absconding while on home arrest. (*Id.*). The defendant's guilty plea was to conspiracy to distribute Schedule II controlled substances in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C), money laundering in violation of 18 U.S.C. § 1956(h) and contempt of court in violation of 18 U.S.C. § 402. (*Id.*, p. 1).

By pleading guilty, Kidd relinquished any right to challenge the sufficiency of the evidence presented as a factual basis for his plea. *United States v. Willis,* 992 F.2d 489 (4th Cir. 1993). Courts have been very protective of the solemnity and finality of a properly counseled guilty plea. When there is a guilty plea, courts do not look back at the adequacy of the

investigation conducted by the defense attorneys prior to the entry of the plea. *See, e.g. Tollett v. Henderson*, 411 U.S. 258, 267, 93 S. Ct. 1602, 1608, 36 L. Ed. 2d 235 (1973):

> When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in McMann.

*United States v. Moussaoui*, 591 F.3d 263, 279 (4th Cir. 2010), as amended (Feb. 9, 2010) held:

> 'When a defendant pleads guilty, he waives all nonjurisdictional defects in the proceedings conducted prior to entry of the plea.' *United States v. Bundy,* 392 F.3d 641, 644 (4th Cir. 2004). The 'guilty plea represents a break in the chain of events which has preceded it in the criminal process.' *Tollett v. Henderson,* 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973). Thus, the defendant who has pled guilty 'has no non-jurisdictional ground upon which to attack that judgment except the inadequacy of the plea,' *Bundy,* 392 F.3d at 644-45, or the government's 'power to bring any indictment at all,' *Broce,* 488 U.S. at 575, 109 S.Ct. 757; *see United States v. Bluso,* 519 F.2d 473, 474 (4th Cir.1975) ('A guilty plea is normally understood as a lid on the box, whatever is in it, not a platform from which to explore further possibilities.'); *see also Blackledge v. Perry,* 417 U.S. 21, 29-30, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974) ('[W]hen a criminal defendant enters a guilty plea, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. Rather, a person complaining of such antecedent constitutional violations is limited ... to attacks on the voluntary and intelligent nature of the guilty plea, through proof that the advice received from counsel was not within the range of competence demanded of attorneys in criminal cases.' (internal quotation marks and citations omitted)).

Kidd was asked if he had any corrections or additions to the factual basis; whether there were any defenses; whether counsel had left anything undone; and, whether he was, in fact, guilty.  Kidd affirmed that he had no additions or corrections to the factual basis, he was guilty, there were no defenses, nor had anything been left undone by his attorney. (PT, pp. 43-45).

A voluntary and intelligent guilty plea amounts to an admission of the material elements of the charged crime, *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969); consequently, it constitutes a waiver of *all claims* relating to non jurisdictional errors

that occurred prior to the plea, including claims relating to alleged constitutional deprivations. *Moussaoui*, 591 F.3d at 269.

C.   Rule 11 Hearing

Statements made during a Rule 11 hearing are presumed to be true and any § 2255 motion that contradicts those sworn statements should be dismissed without a hearing. *United States v. Lemaster*, 403 F.3d 216, 221-222 (4th. Cir. 2005). Because a defendant's statements carry such a presumption, they "present 'a formidable barrier in any subsequent collateral proceedings.'" (*Id.*).

The transcript of Kidd's Rule 11 hearing contains the following exchanges between the defendant and the Court:

> THE COURT:   Mr. Kidd, is that your signature on the first and all subsequent pages next to the date 24 April, '12?
>
> MR. KIDD:   Yes, sir.
>
> THE COURT:   You understand and agree with all the terms and provisions of the plea agreement?
>
> MR. KIDD:   Yes, sir.
>
> THE COURT:   Did you go over the plea agreement with your counsel, Mr. Leary, before you signed it, did he answer to your satisfaction any questions that you had about the plea agreement?
>
> MR. KIDD:   Yes, sir.
>
> THE COURT:   And I notice that there have been some interlineations and changes to the plea agreement, specifically at paragraph one, paragraph two, and paragraph three, which change the mandatory minimum sentence and also the fine that was set forth, and alto the statutory reference on the information. Are those your initials on those changes?
>
> MR. KIDD:   Yes, sir.
>
>     …. (PT, p. 14)

13

THE COURT: Mr. Kidd do you understand that rather than pleading guilty here this morning, you have a right to continue to plead not guilty and to maintain that not guilty plea to all these charges throughout the rest of the proceedings, including the trial in this case. And do you understand that sir?

MR. KIDD: Yes, sir.

…. (PT, p. 23)

THE COURT: And do you understand also that if you continue to plead not guilty and went to trial, you could be tried by a jury, and a jury composed of 12 regular jurors, one or more alternates, they could be impaneled to hear all the evidence and decide whether or not you were innocent or guilty. Do you understand that, sir?

MR. KIDD: Yes, sir.

THE COURT: And do you understand also that if you went to trial, you could confront the witnesses that came in to testify against you, Mr. Leary could cross-examine those witnesses, and he could also move to suppress any evidence that he felt had been improperly obtained against you? Do you understand that, sir?

MR. KIDD: Yes, sir.

…. (PT, p. 24)

THE COURT: And do you understand also that if you went to trial, you could present evidence on your on behalf and Mr. Leary could ask the clerk to subpoena witnesses to come in and testify for you, if that was your desire. Do you understand that, sir?

MR. KIDD: Yes, sir.

THE COURT: And do you understand, Mr. Kidd, these are all the rights that you're giving up by entering a plea of guilty here this morning?

MR. KIDD: Yes, sir.

THE COURT: Do you understand that if you enter a plea of guilty, there isn't going to be any trial, or at least not as to you, or any jury verdicts as to you, or any findings of either innocence or guilt based upon disputed evidence presented either to a court or to a jury. Do you understand that?

MR. KIDD: Yes, sir.

THE COURT: Mr. Kidd, do you believe that you fully understand the consequences of entering a plea of guilty here this morning?

MR. KIDD: Yes, sir.

…. (PT, p. 25-26)

THE COURT: Mr. Kidd, any additions or corrections you'd like to make to the testimony of Officer and Agent Robert L. Manchas?

Mr. KIDD: No, sir.

…. (PT, p. 43)

THE COURT: Have the pleas of guilty that you've just given me been the result of any threats or coercion or harassment of you by anybody at any time?

MR. KIDD: No, sir.

…. (PT, p. 44)

THE COURT: Do you believe your attorney, Mr. Leary, has adequately and effectively represented you throughout all these matters?

MR. KIDD: Yes, sir.

THE COURT: Do you believe that your attorney has left anything at all undone that you think he should have done on your behalf?

MR. KIDD: No, sir.

THE COURT: Have you or your attorney found any defense to any of the charges made in this case to which you are pleading guilty?

MR. KIDD: No, sir.

…. (PT, p. 45)

THE COURT: Mr. Kidd, any additions or corrections you'd like to make to the testimony of Officer and Agent Robert L. Manchas?

Mr. KIDD: No, sir.

…. (PT, p. 43)

During Kidd's plea colloquy, he affirmed that he understood and agreed to the terms of the plea agreement, that he had discussed the plea agreement with his counsel, that he understood the consequence of entering a guilty plea, that he had not been coerced into pleading guilty, that his counsel had left nothing undone that he felt should be done, and, finally, that there were no defenses to the charges. If the face of Kidd's testimony during his Rule 11 colloquy, the contrary allegations in his § 2255 motion are patently frivolous or false.

The Court took due precaution in concluding that Kidd understood the terms of the plea agreement and voluntarily signed the agreement. Kidd was placed under oath and has offered no evidence that his answers were not truthful or coerced by his attorney. "Absent clear and convincing evidence to the contrary, a defendant is bound by the representations he makes under oath during a plea colloquy." *Fields v. Att'y Gen. of Marlyand*, 956 F.2d 1290, 1299 (4th Cir. 1992). *See also Mabry v. Johnson*, 467 U.S. 504, 508 (1984) ("A voluntary and intelligent plea of guilty made by an accused person who has been advised by competent counsel, may not be collaterally attacked."). As the record establishes, Kidd knowingly and properly admitted his involvement and the relevant conduct related thereto.

D.     Due Process Violations

Kidd alleges that he was denied the right to testify at his sentencing hearing, however, a review of the sentencing transcript clearly contradicts this assertion. After the government's factual witnesses was vigorously cross-examined by defense counsel, the Court advised Kidd that he had the right to make a statement, either in mitigation of sentence "or in explanation of any of these matters." (ST, p. 30). Kidd availed himself of the opportunity and requested leniency in his sentence. (*Id.*, p. 32). Significantly, Kidd made no mention of any dissatisfaction with his counsel nor did he challenge the factual testimony of the government's witness who had testified regarding the discovery of the firearm, the quantity of pills, and Kidd's role in the

conspiracy. Moreover, during the Rule 11 proceeding, after hearing from the government's witness regarding the same matters, when the Court asked Kidd if he had "any additions or corrections you'd like to make to the testimony of Officer and Agent Robert L. Manchas?" Kidd replied "No, sir." (PT, p. 43).

Kidd's allegation that he unknowing and involuntarily waived his right to trial is also clearly refuted by the record. A review of the Rule 11 transcript shows the Court took due precaution in assuring that Kidd understood the consequences of entering a guilty plea. (PT, pp. 23-29).

F.   Ineffective Assistance of Counsel

The defendant has the burden of proving an allegation of ineffective assistance of counsel by a preponderance of the evidence. *United States v. Moore*, 993 F.2d 1541 (4th Cir. 1993). In evaluating claims for ineffective assistance of counsel, counsel's conduct is measured under the two-part analysis outlined in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart v. Fretwell*, 506 U.S. 364 (1993) (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)).

A reviewing court does not "grade" trial counsel's performance and there is a strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." *Carter v. Lee*, 283 F.3d 240, 249 (4th Cir. 2002) (citing *Strickland v. Washington*, 466 U.S. at 697). Essentially, the reviewing court must not "second-guess" counsel's

17

performance and must "evaluate counsel's performance 'from counsel's perspective at the time.'" *Hunt v. Lee,* 291 F.3d 284, 289 (4th Cir. 2002) (citing *Strickland v. Washington*, 466 U.S. at 689). Furthermore, the standard of reasonableness is objective, not subjective. *See Strickland*, 466 U.S. at 688.

The burden is increased when a defendant pleads guilty. In *Hill v. Lockhart*, 474 U.S. 52 (1985), the Supreme Court concluded that the two-part inquiry established in *Strickland v. Washington* for determining the effectiveness of counsel also applies in cases in which the defendant pleads guilty. *Id.* at 57. Under the standard, a petitioner must first prove that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. In addition, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill,* 474 U.S. at 59; *see, also Hooper v. Garraghty*, 845 F.3d 471, 475 (4th Cir. 1988).

It is clear from the record that defendant's counsel was not ineffective and that Kidd's allegations are facially inaccurate.

## IV. <u>CONCLUSION</u>

In sum, the defendant's Motion should not be well taken since a review of the record demonstrates that defendant's counsel was not ineffective and that defendant's allegations are factually inaccurate.

The defendant has failed to demonstrate that he is entitled to any relief in his Motion. "In order to obtain an evidentiary hearing on an ineffective assistance claim - - or, for that matter, on any claim - - a habeas petitioner must come forward with some evidence that the claim might have merit. Unsupported, conclusory allegations do not entitle a habeas petitioner to an evidentiary hearing." *Nickerson v. Lee*, 971 F.2d 1125, 1136 (4th Cir. 1992), *cert. denied*, 507 U.S. 923 (1993), abrogation on other grounds recognized, *Yeatts v. Angelone*, 166 F.2d 255 (4th

Cir. 1999). As such, the United States requests dismissal of the petition on the record, without the need for a hearing.

                Respectfully submitted,

                WILLIAM J. IHLENFELD, II
                United States Attorney

By:   /s/ John C. Parr
       John C. Parr
       Assistant United States Attorney/Bar Number: 2819
       United States Attorney's Office
       1125 Chapline Street, Suite 3000
       Wheeling, West Virginia 26003
       Telephone: (304) 234-0100
       Fax: (304) 234-0111
       E-mail: John.Parr@usdoj.gov

CERTIFICATE OF SERVICE

I, John C. Parr, Assistant United States Attorney for the Northern District of West Virginia, hereby certify I electronically filed the **UNITED STATES' RESPONSE TO MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY** with the Clerk of the Court using the CM/ECF system, and, I hereby certify that I have mailed, by United States Postal Service, the document to the following non-CM/ECF participant:

David Lee Kidd, II
FCI Fort Dix
Unit 5471
Inmate Mail/Parcels
P. O. Box 2000
Fort Dix, NJ  08640


Dated:  November 12, 2014


/s/ John C. Parr
John C. Parr
Assistant United States Attorney/Bar Number: 2819
United States Attorney's Office
1125 Chapline Street, Suite 3000
Wheeling, West Virginia 26003
Telephone: (304) 234-0100
Fax: (304) 234-0111
E-mail: John.Parr@usdoj.gov